FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAY 0 9 2019

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA )
ex rel. JAMES RUSSELL, )
)
    Plaintiff-Relator, )
)
v. )
)
FRESENIUS MEDICAL CARE )
HOLDINGS, INC. d/b/a FRESENIUS )
MEDICAL CARE NORTH AMERICA; )
and FRESENIUS MANAGEMENT )
SERVICES, INC.; )
)
    Defendants. )

Case No. 1 19 - CV - 2114

**JURY TRIAL DEMANDED**
**FILED UNDER SEAL**

## COMPLAINT

1.    Relator James Russell brings this action on behalf of himself and the United States of America against Defendant Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care North America and Fresenius Management Services, Inc. (collectively "Fresenius") for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("False Claims Act").

2.    Fresenius engaged in a scheme to defraud the federal Government by writing off false balances as "bad debt" and submitting them to Medicare for partial reimbursement.

3.      Relator also brings this action under the Age Discrimination in Employment Act "ADEA"), 29 U.S.C. §§ 621 *et seq*.; 42 U.S.C. § 1981 ("Section 1981"); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"); and the Family Medical Leave Act of 1993 ("FMLA"). Relator asserts claims for age discrimination under the ADEA. Relator asserts claims for race discrimination under Section 1981. Relator asserts claims for race and gender discrimination under Title VII. Relator asserts claims for FMLA interference and retaliation under the FMLA. Relator seeks injunctive and declaratory relief, back pay and lost benefits, front pay or reinstatement to a full-time position with commensurate benefits, compensatory damages, liquidated damages, punitive damages, and attorneys' fees and costs of litigation.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. §§ 1331, 1345; and 28 U.S.C. § 1343 (civil rights).

5.      Venue is proper in this district under 28 U.S.C. §§ 1391(b); 42 U.S.C. §2000e-5(f)(3); and under 31 U.S.C. § 3732(a), as one or more of the defendants resides or transacts business in this jurisdiction and violations of the False Claims Act described herein occurred in this district.

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

6.      As required by the federal False Claims Act, 31 U.S.C. § 3730(b)(2), Relator

has provided to the Attorney General of the United States and the United States

Attorney for the Northern District of Georgia a statement of all material evidence

and information related to the Complaint ("Disclosure Statement"). The Disclosure

Statement includes attorney-client communications and work product of Relator's

attorneys and is submitted to the Government in its capacity as potential co-

counsel in this litigation; therefore, the Disclosure Statement is confidential and

protected by the joint prosecutorial privilege.

## GOVERNMENT HEALTHCARE PROGRAMS

7.      Title XVIII of the Social Security Act, U.S.C. §§ 1395 *et seq.,* establishes

the Health Insurance for the Aged and Disabled Program, known as the Medicare

program. The Secretary of the United States Department of Health and Human

Services ("HHS") administers the Medicare Program through the Centers for

Medicine and Medicaid Services ("CMS").

8.      The Medicare program is comprised of four parts. Medicare Part A

("Hospital Insurance") provides basic insurance for the costs of hospitalization and

post hospitalization care. 42 U.S.C. §§ 1395c-i-5. Medicare Part B ("Medical

Insurance") is a federally subsidized, voluntary insurance program that covers the

fee schedule amount for doctors' services, outpatient care, medical supplies, and

-3-

laboratory services. 42 U.S.C. §§ 1395j-w-5. Medicare Part C ("Medicare Advantage Plans") is a plan offered by private insurers that contract with Medicare to provide Part A and Part B benefits. 42 U.S.C. §§ 1395w-21-w-28. Medicare Part D ("Prescription Drug Coverage") is a plan offered by private insurers approved by Medicare to provide basic insurance for prescription drugs. 42 U.S.C. §§ 1395w-101-w-154.

9.      Reimbursement for Medicare Part C claims is made by the United States through CMS. CMS makes fixed monthly payments to each Medicare Choice organization for each enrolled individual, i.e., a capitated payment.

10.     As part of the enrollment process for the Medicare program, providers certify that they agree to abide by the Medicare laws, regulations and program instructions and that they understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions.

## PARTIES

11.     Defendant Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care North America holds itself out to have "an industry-leading network of more than 2,200 dialysis facilities, outpatient cardiac and vascular labs, and urgent care centers, as well as the country's largest practice of hospitalist and post-acute

providers."

12.    Fresenius Management Services, Inc. ("FMS") is part of the Fresenius Medical Care North America related entities. It handles the "professional services" for Fresenius, including HR and employment.

13.    Relator James Russell was employed by FMS from April 6, 2012 through March 9, 2018.

14.    During his employment, Relator worked at Fresenius's Peachtree Revenue Center at 1940 Lodge Road NW in Kennesaw, Georgia (the "Peachtree office").

15.    Initially Relator was a Senior Collections Patient Account Representative, but in January 2013, he was moved to Senior Patient Account Representative for the "self-pay" team (n/k/a Patient Balance Solutions, or "PBS").

16.    In this role, Relator was responsible for leading the self-pay team, and his job responsibilities included reviewing patient billing records—including seeing what amounts were billed to and paid by Medicare—and communicating directly with patients about outstanding balances not covered by their Medicare benefits.

17.    In 2016, Relator was promoted to Supervisor of the Self Pay department at the Peachtree office.

18.    In this role, Relator continued to lead the self-pay team and have direct access to patient billing records and communication with Medicare beneficiaries

about their outstanding balances.

19.    In 2017, Relator's title was changed to Supervisor for Patient Balance

Solutions, but his responsibilities generally remained unchanged.

## FACTUAL ALLEGATIONS

20.    Private insurance only pays for the first three months of dialysis, after which

a thirty-month coordination period follows in which Medicare pays for some, but

not all, of the costs. After the coordination period, Medicare pays the entire cost of

treatment.

21.    During the initial thirty-three months, patients may be responsible for paying

copayments and deductibles to Fresenius for their treatments ("self-pay balances").

22.    Under 42 C.F.R. § 413.89, a percentage of the bad debts attributable to the

deductibles and coinsurance amounts are reimbursable under the Medicare

program.

23.    42 C.F.R. § 413.89(b)(1) defines "bad debts" as "amounts considered to be

uncollectible from accounts and notes receivable that were created or acquired in

providing services."

24.    Fresenius is required by law (42 U.S.C. § 1395g; 42 C.F.R. § 413.20(b)) to

submit to CMS (via a Medicare Administrative Contractor) an annual cost report,

Form CMS-265-11, that indicates—on Line 6 of Worksheet S-2—whether it is

seeking reimbursement for bad debts resulting from Medicare deductible and coinsurance amounts that are uncollectible from Medicare beneficiaries.

25.    By indicating "yes" to this question, it is then required to submit a completed Exhibit 1 (Listing of Medicare Bad Debts and Appropriate Supporting Data) or schedules supporting the bad debts claimed that includes the patient name, health insurance claim number, dates of service, date the first bill was sent, date collection efforts ceased, remittance advice dates, unpaid deductibles and coinsurance, and total Medicare bad debts.

26.    Exhibit 1 indicates that the bad debt "amounts must not be claimed unless the provider bills for these services with the intention of receiving payment."

27.    Fresenius is also required to complete Worksheet E, Calculation of Bad Debt Reimbursement, which advises that "Allowable bad debts must relate to specific Medicare deductibles and coinsurance amounts."

28.    Determination of bad debt amounts for the basic case-mix adjusted composite rate payment portion of the ESRD PPS payment, is based on the percentage of basic composite rate payment costs to total costs on a facility specific basis. The facility specific composite rate percentage is applied to the facility's total bad debt amounts associated with the ESRD PPS payment. The

resulting bad debt amount is used to determine the allowable Medicare bad debt payment in accordance with 42 CFR 413.89 of the regulations.

29.    The Cost Report includes a certification by a Fresenius corporate representative, such as its CFO, that "to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."

30.    Prior to the certification, the Cost Report states, in all caps, "MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL, AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW."

31.    Relator Russell set up and managed the Peachtree office's self-pay team, the first of its kind at Fresenius and the model for all future self-pay teams around the country.

32.    The self-pay team was responsible for collecting the self-pay balances from Fresenius customers, i.e., amounts that their insurance did not pay.

33.    Fresenius's policy is to send patients five invoices and make two calls to patients owing money. If those collections efforts fail, Fresenius writes the unpaid balance off as "bad debt."

34.    The Peachtree Revenue Center was one of approximately 6-8 such centers nationwide, each of which is responsible for the accounts receivable for a geographic region.

35.    As part of its self-pay review, Relator's PBS team would review Fresenius's Soarian billing database for "false guarantor balances."

36.    These balances are the result of system errors which incorrectly show that patients owe the company money that they do not actually owe.

37.    Relator does not know how or why these errors come about, or how the dollar amounts are calculated in Soarian, but they are often for hundreds of thousands of dollars, allegedly owed by patients with Medicare or other insurance benefits.

38.    Sometimes Fresenius would correct the false guarantor balances identified by Relator's team, but often new false guarantor balances would appear every month for those same patients.

39.    Some of the other revenue centers around the country did not review the billing for false guarantor balances, and so when the self-pay teams could not

collect the false guarantor balances, Fresenius submitted them to CMS as bad debt without ever confirming their validity or discussing whether to correct them.

40.    In or about January 2017, new management at Fresenius's corporate office became responsible for managing the self-pay teams around the country: Joel Rothman, Senior Manager, Revenue Cycle for Patient Balance Solutions; and Gina Broussard, Senior Director, Revenue Cycle for Patient Balance Solutions.

41.    In early 2017, Broussard began eliminating self-pay departments around the country, merging their responsibilities with the Patient Balance Solutions ("PBS") department.

42.    Broussard centralized the PBS department in a single headquarters in Plano, Texas, where a call center was set up to handle collections.

43.    The Peachtree office was not immediately closed, however, and continued to perform its self-pay duties.

44.    During this time, Rothman and Broussard instructed Relator to report false guarantor balances to them, and they would decide which balances to correct or write off.

45.    Rothman and Broussard twice had Relator come to Fresenius's PBS headquarters in Plano, TX to train its Revenue Cycle Senior Reps and Supervisors

to look for false guarantor balances, once in or about April 2017 and again in or about October 2017.

46.     In January 2018, on a weekly team call with Relator, Broussard, Rothman, Vannesa Hernandez (PBS Manager, Revenue Cycle), Melvin Jordan (PBS Senior Patient Account Representative), and Lindie Johnson (Operations Manager), Joel Rothman stated that Fresenius was no longer going to look for and correct false guarantor balances.

47.     Rothman told Relator that he and his team should accept whatever balance the software indicated as being true and correct, and the team was to focus its efforts solely on collecting self-pay balances and pre-listed bad debt.

48.     As a result, millions of dollars in false guarantor balances were improperly billed to Fresenius customers, most of which was deemed uncollectible and submitted to Medicare as "bad debt."

49.     Based on his 6 years of experience reviewing Fresenius's patient balances and accounts receivable records, Relator estimates that since Fresenius stopped reviewing its billing for false guarantor balances, approximately 60%-75% of the bad debt submitted to Medicare for reimbursement on the cost reports are false.

50.   Notwithstanding that Fresenius knows that much of its self-pay balance information is incorrect, it submits claims for reimbursement to Medicare based on these unpaid balances.

51.   Requests for reimbursement for copayments and deductibles that were incorrectly generated are false claims.

52.   Invoices and billing statements generated by Soarian with false data are false records material to the payment of the claims.

*Discrimination and Retaliation Against Relator*

53.   When Relator saw the extent of the bad debt write-offs that were occurring under Rothman and Broussard's watch, he implored other Revenue Cycle managers at the corporate office to implement a clean-up program, but this was immediately stopped by Rothman and Broussard.

54.   On March 9, 2018, Rothman and Broussard informed Relator that Fresenius was closing the Peachtree office and terminating his position.

55.   Relator's entire PBS team was placed in other positions at Fresenius.

56.   Relator, however, was not offered another position at the company.

## COUNT I
## VIOLATION OF 31 U.S.C. § 3729 – FEDERAL FCA
### (Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care North America)

57.    Relator hereby incorporates and realleges all other paragraphs as if fully set forth herein.

58.    As set forth above, Defendant Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care North America knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

59.    As set forth above, Defendant Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care North America knowingly made, used, or caused to be made or used, false records or statements material to false claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

60.    Due to Defendant's conduct, the United States Government has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim, record, or statement. 31 U.S.C. § 3729.

61.    Relator is entitled to reasonable attorneys' fees, costs, and expenses. 31 U.S.C. § 3730(d)(1).

## COUNT II
## VIOLATION OF 31 U.S.C. § 3730 – RETALIATION
### (Fresenius Management Services, Inc.)

62.    Relator hereby incorporates and realleges all other paragraphs as if fully set forth herein.

63.    Defendant FMS violated Relator Russell's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against Relator Russell for lawful acts done by Relator Russell in furtherance of other efforts to stop one or more violations alleged in this action.

64.    As a result of FMS's actions, Relator Russell has suffered damages in an amount to be shown at trial.

**COUNT III**
**VIOLATION OF TITLE VII AND SECTION 1981– RACE DISCRIMINATION**
**(Fresenius Management Services, Inc.)**

65.    Relator hereby incorporates and realleges all other paragraphs as if fully set forth herein.

66.    Relator satisfied all administrative prerequisites to perfect his claims under Title VII, Section 1981, and the ADEA. Specifically, Relator timely filed his Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and the EEOC issued a Notice of Right to Sue.

67.    Relator brings this action within ninety (90) days of receipt of his Notice of Right to Sue.

68.   FMS is an employer within the meaning of 42 U.S.C. § 2000e.

69.   FMS is an employer as defined by Title VII and Section 1981.

70.   FMS is a covered employer under Title VII and Section 1981.

71.   FMS may be served with summons and a copy of the Complaint in this action by delivering process to its registered agent for service of process, CT Corporation System, 289 S Culver St., Lawrenceville, Georgia, 30046.

72.   Relator is an African American male.

73.   Throughout the course of his employment with FMS, Relator has been passed over for several promotions dating back to 2015.

74.   After working as a Senior Patient Account Representative at the Peachtree Revenue Center for four (4) years, Relator was finally promoted to Supervisor of the Self Pay Department in 2016.

75.   In 2017, the Self Pay department was transferred to the PBS department and Relator's title changed from Supervisor of the Self Pay department to Supervisor of the PBS department.

76.   Relator supervised seven (7) employees who worked as Patient Account Representatives in the PBS department.

77.   While under Relator's supervision, Relator and his team were consistently praised for their work.

78.    In June 2017, Rothman told Relator that as a rule, he could not be promoted

to a manager role because he did not have at least ten (10) employees reporting

directly to him. Relator only had eight (8) employees on his team at the time.

79.    Rob Hootkins, a Caucasian male who was younger than Relator, was hired

as a manager even though he had less employees on his team than Relator as well

as less responsibilities than Relator.

80.    On February 9, 2018, FMS notified Relator's team that their positions and

the Atlanta PBS department were being eliminated as of March 9, 2018, due to an

alleged change in business needs.

81.    Broussard and Rothman made the decision to eliminate the PBS department.

82.    Broussard, who is a Caucasian female, is substantially younger than Relator

and outside of his protected class.

83.    Rothman, who is a Caucasian male, is substantially younger than Relator

and outside of Relator's protected class.

84.    In or around January or February 2018, Rothman promoted Vannesa

Hernandez to Manager, Patient Balance Solutions in Plano, Texas, where the

Patient Balance Solutions department is headquartered.

85.    Hernandez, who is a Hispanic female, is substantially younger than Relator

and outside of Relator's protected class.

86.     When Rothman promoted Hernandez, Relator was required to report directly to Hernandez.

87.     Hernandez only had 1.5 years of experience in PBS before being selected for the Manager of PBS position in January 2018.

88.     Relator was more than qualified for the Manager of PBS position.

89.     FMS never posted the Manager of PBS position.

90.     Relator would have applied for the Manager of PBS position if the vacancy had been announced.

91.     FMS's failure to post the Manager of PBS position prevented Relator from applying for the position.

92.     Rothman told Relator that he did not post the Manager of PBS position because Hernandez was more of what he and Broussard wanted in the manager position.

93.     Relator was more experienced than Hernandez.

94.     Hernandez joined the PBS team in June 2016 as a Senior Patient Accounts Representative. A year later Hernandez was promoted to Supervisor of Collections in 2017. In 2018, Hernandez was promoted to Manager of PBS.

95.     Throughout the course of Relator's employment, FMS promoted individuals outside of Relator's protected class in much less time than the four years it took

FMS to promote Relator from Senior Patient Accounts Representative to a supervisor position.

96.    Following the elimination of the Atlanta PBS department, FMS placed Relator's staff into various positions in other departments.

97.    Relator was the only employee of the Atlanta PBS department that FMS did not place into another position.

98.    In the past, when an employee's position was eliminated due to a Reduction in Force, FMS consulted with leadership staff to place the affected employee into a vacant position and did not require the employee to compete for a position.

99.    When Relator's supervisory position was eliminated, FMS told Relator he could apply for and compete for a new position.

100.   Beginning as early as February 9, 2018, Relator applied for several supervisory positions and one (1) manager position with Fresenius.

101.   Relator was selected to interview for all of the positions to which he applied.

102.   At the time of application, Relator had thirty (30) years of experience in the healthcare industry, including prior experience in customer service, claims, sales and marketing, insurance, self-pay collections, government and commercial collections, auditing, training, provider relations, and provider contracting.

103.   Over the course of his employment with FMS, Relator gained significant experience inside and outside of the PBS department.

104.   As a supervisor, Relator was exposed to other departments and he worked closely with other departments—both of which allowed him to gain extensive knowledge of departments outside of the PBS department.

105.   While a supervisor, Relator trained his team members to handle issues in departments outside of the PBS department.

106.   Relator acquired a certain level of expertise and experience that suited him well for any one of the positions he applied for following the elimination of the PBS department.

107.   Ryan Maltby ("Maltby"), Director of Revenue Cycle, interviewed Relator for a position as Manager for Commercial Collections / Government Collections.

108.   Maltby is a Caucasian male who is younger than Relator.

109.   Relator was more than qualified for the Manager for Commercial Collections / Government Collections position.

110.   Relator was not selected for the Manager for Commercial Collections / Government Collections position.

111.   Instead, Maltby selected Nancy Higgins ("Higgins") for the Manager for Commercial Collections / Government Collections position.

112.    Higgins is a Caucasian female who is outside of Relator's protected class.

113.    At the time of the selection decision, Higgins was eight years younger than Relator.

114.    Higgins is substantially younger than Relator.

115.    Relator previously supervised Higgins.

116.    Relator is substantially more experienced and better qualified than Higgins.

117.    On February 8, 2018, Relator interviewed for a Supervisor of Commercial Collections position.

118.    After landing the Manager for Commercial Collections position, Higgins interviewed Relator for the Supervisor of Commercial Collections position.

119.    Relator was more than qualified for the Supervisor of Commercial Collections position.

120.    Higgins informed Relator he was not selected for the Supervisor of Commercial Collections position because the "decision came down to which candidate was the best fit for the team and [Nancy] decided to go with another candidate."

121.    On February 16, 2018, Relator learned that Jessica Buck ("Buck"), a Caucasian female, was selected for the Supervisor of Commercial Collections position.

122.   Buck is substantially younger than Relator and outside of Relator's protected race and gender.

123.   Buck was a recent college graduate.

124.   Relator helped to train Buck when she was hired as a Patient Account Representative.

125.   Buck was less experienced than Relator.

126.   Buck only had two years of experience as a Patient Account Representative before being placed into the Supervisor of Commercial Collections position.

127.   Days before learning that he was not selected for the Supervisor of Commercial Collections position, Relator heard Manager Rebecca D. Miller ("Miller") state that "[Maltby] told her to select someone a little closer to the team's age and experience, so it would be a better blend with the team."

128.   Sometime before Relator applied for the Supervisor of Commercial Collections position, Chase Newman ("Newman") was promoted to a Supervisor of Commercial Collections position.

129.   FMS promoted Newman to Supervisor of Commercial Collections over Relator.

130.   Newman is a Caucasian male who is substantially younger than Relator.

131.   Relator was more than qualified for the Supervisor of Commercial

Collections position.

132.   Newman was a recent college graduate.

133.   At the time of the promotion decision, Newman had only worked for FMS

for approximately 1.5 years.

134.   Newman was a Senior Patient Accounts Representative prior to being

promoted to the Supervisor of Commercial Collections position.

135.   Newman was subsequently promoted to Office Manager.

136.   Newman was less experienced than Relator.

137.   FMS promoted Newman three times within his 1.5 years of employment.

138.   Newman is outside of Relator's protected class.

139.   Relator applied for a Cash Follow-Up Supervisor position.

140.   Miller interviewed Relator for the Cash Follow-Up Supervisor position.

141.   Based on Relator's prior experience, Relator was more than qualified for the

Cash Follow-Up Supervisor position.

142.   As the Supervisor of Patient Balance Accounts, Relator was largely

responsible for cash follow up which required him to know and experience a full

scope of issues.

143. On February 15, 2018, Miller informed Relator that he was not selected for the Cash Follow-Up Supervisor position.

144. Miller told Relator his "overall Revenue Cycle job knowledge [was] solid, but because of the team's needs, [she] just [did] not think [Relator was the] correct fit for Supervisor."

145. Miller is substantially younger than Relator.

146. Miller selected Alma (Dee) Chastain ("Chastain") for the Cash Follow-Up Supervisor position.

147. Chastain is a Caucasian woman who is younger than Relator.

148. Chastain is outside of Relator's protected class.

149. Relator applied for an Insurance Specialist position.

150. Relator was more than qualified for the Insurance Specialist position.

151. On or around February 18, 2018, Kathy Brereton told Relator he was not hired for the Insurance Specialist position because she "decided to proceed with another candidate whose background more closely meets our needs at this time."

152. The selected candidate, Richelle Davis Brown ("Brown") was less experienced than Relator.

153. Brown is an African American woman who is under the age of forty (40).

154. Brown is outside of Relator's protected class.

155.  Relator applied for two (2) supervisor positions in the Central Verification

Office ("CVO") department.

156.  In late February, Sherri Crouch-Wilson ("Crouch-Wilson"), who managed

the CVO department, told Relator that after talking with Maltby, she decided to go

with two (2) other candidates.

157.  Crouch-Wilson is a Caucasian female and she is younger than Relator.

158.  Relator was more than qualified for the supervisor positions in the CVO

department.

159.  Crouch-Wilson told Relator that she knew he was qualified, could lead the

team, and that he "was the perfect person for the position."

160.  Crouch-Wilson told Relator he was more than qualified for the position and

his experience and number of years with the company was no match for any of the

other candidates.

161.  Relator was not selected for the Supervisor Collections position.

162.  Instead, FMS selected Mary Mitchell ("Mitchell") for one of the two

Supervisor Collections position in the CVO department.

163.  Mitchell is a Caucasian female who was under the age of forty (40) at the

time of the hiring decision.

164.    Mitchell was substantially younger than Relator and outside of Relator's protected race and gender.

165.    Mitchell was less experienced than Relator.

166.    Mitchell was a Patient Account Representative prior to being selected for the Supervisor Collections position.

167.    FMS selected Kristi Nelson ("Nelson") for the other Supervisor Collections position in the CVO department.

168.    Nelson is an African American female who was substantially younger than Relator.

169.    Nelson was less experienced than Relator.

170.    Nelson was a Patient Account Representative prior to being selected for the Supervisor Collections position.

171.    On February 27, 2018, Relator interviewed for a possible opening as a Patient Intake Coordinator / Supervisor.

172.    Relator was more than qualified for the Patient Intake Coordinator / Supervisor position.

173.    After interviewing for the Patient Intake Coordinator/Supervisor position, Relator was told there would not be an opening for the position so a hiring decision would not be made.

-25-

174. Relator was not selected for any of the positions he interviewed for after his department was eliminated.

175. Instead of selecting Relator, FMS selected younger and less experienced employees outside of Relator's protected class to fill the positions Relator sought.

176. The selected candidates were largely employees who had only been employed by FMS for six (6) months to one (1) year.

177. FMS's decision to terminate Relator's employment became effective on March 9, 2018.

178. At the time of Relator's termination, Relator's most recent performance rating was at a level 2, "Superior."

179. FMS often promoted and encouraged the recruitment and hiring of workers who were younger than Relator.

180. Upon information and belief, less than 1% of the employees at the Peachtree Revenue Center were Relator's age or older.

181. FMS's rationale for terminating Relator's employment and failing to place him into a vacant position thereafter was a pretext for unlawful discrimination.

182. By the conduct stated above, FMS discriminated against Relator because of his race in violation of Title VII and Section 1981.

183.   FMS intentionally discriminated against Relator on account of his race by terminating his employment and then failing to select him for a vacant position in violation of Title VII of the Civil Rights Act of 1964, as amended.

184.   FMS intentionally discriminated against Relator on account of his race by terminating his employment and then failing to select him for a vacant position in violation of Section 1981.

185.   As a direct and proximate result of FMS's acts of intentional discrimination, Relator has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job related benefits.

186.   In addition, FMS's actions have caused, continue to cause, and will cause Relator to suffer damages for emotional distress, mental anguish and other non-pecuniary losses.

187.   By discriminating against Relator, FMS acted willfully, wantonly, and intentionally to harm Relator and his federally protected rights. Additionally, and in the alternative, FMS acted with reckless disregard for Relator and his federally protected rights.

## COUNT IV
## VIOLATION OF TITLE VII – GENDER DISCRIMINATION
### (Fresenius Management Services, Inc.)

188.   Relator hereby incorporates and realleges all other paragraphs as if fully set forth herein.

189.   By the conduct stated, FMS discriminated against Relator because of his gender in violation of Title VII.

190.   FMS intentionally discriminated against Relator on account of his gender by terminating his employment and then failing to select him for a vacant position in violation of Title VII of the Civil Rights Act of 1964, as amended.

191.   As a direct and proximate result of FMS's acts of intentional discrimination, Relator has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job related benefits.

192.   In addition, FMS's actions have caused, continue to cause, and will cause Relator to suffer damages for emotional distress, mental anguish and other non-pecuniary losses.

## COUNT V
## VIOLATION OF TITLE VII– INTERSECTIONAL DISCRIMINATION BASED ON RACE AND GENDER
### (Fresenius Management Services, Inc.)

193.   Relator hereby incorporates and realleges all other paragraphs as if fully set forth herein.

194. Relator is a member of a protected subclass on the basis of his race and gender.

195. By the conduct stated, FMS discriminated against Relator because of his race and gender in violation of Title VII.

196. FMS intentionally discriminated against Relator on account of his race and gender by terminating his employment and then failing to select him for a vacant position in violation of Title VII of the Civil Rights Act of 1964, as amended.

197. As a direct and proximate result of FMS's acts of intentional discrimination, Relator has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job related benefits.

198. In addition, FMS's actions have caused, continue to cause, and will cause Relator to suffer damages for emotional distress, mental anguish and other non-pecuniary losses.

### COUNT VI
### VIOLATION OF ADEA – AGE DISCRIMINATION
### (Fresenius Management Services, Inc.)

199. Relator hereby incorporates and realleges all other paragraphs as if fully set forth herein.

200. FMS is a covered employer under the ADEA.

201.   Relator is sixty years old and, at all relevant times, was an employee
protected by the ADEA.

202.   Out of the eight (8) employees in the Atlanta PBS department, Relator was
the oldest employee at age fifty-eight (58).

203.   While Relator's staff included other African American men who were over
the age of forty (40), Relator was older than those individuals.

204.   All of the employees in the Atlanta PBS department were at least nine (9)
years younger than Relator, if not more.

205.   One of the employees in Relator's department was a forty-seven (47) year
old Patient Account Representative, who received an internal offer from another
team when FMS eliminated the Atlanta PBS department.

206.   One of the employees in Relator's department was a forty-six (46) year old
Patient Account Representative, who received an internal offer from another team
when FMS eliminated the Atlanta PBS department.

207.   Relator did not receive an internal offer from another team when FMS
eliminated the PBS department.

208.   Relator was the only employee who was not placed into a new position
following FMS's elimination of the Atlanta PBS department.

209.  Maltby harbored a discriminatory bias against older employees under his leadership.

210.  In his position, Maltby systematically sought to recruit and hire recent college graduates.

211.  Maltby often spoke about recruiting and hiring youth.

212.  Maltby often sought to hire youth at Career Fairs.

213.  Maltby often sought to hire youth for internship opportunities.

214.  Maltby frequently told other employees that he "believed in youth" and "believed in giving young people a chance."

215.  Bill Crawford ("Crawford"), VP of Finance, also promoted the hiring of youth by FMS.

216.  Crawford systematically sought to recruit and hire recent college graduates.

217.  At the time of his termination, Relator was more qualified for the positions he applied for than the selected candidates, all of whom were outside of Relator's protected class.

218.  FMS discriminated against Relator in violation of the ADEA by failing to select Plaintiff for a vacant position following the elimination of his position and the entire PBS department.

219.   The individuals FMS selected over Relator were outside of Relator's protected class.

220.   The individuals FMS selected over Relator were younger than Relator.

221.   Relator was more than qualified to fill the positions he applied for following the elimination of the PBS department.

222.   FMS authorized, ratified, and condoned the discriminatory bias members of management held against older employees.

223.   By the conduct stated, FMS discriminated against Relator because of his age in violation of the ADEA.

224.   FMS intentionally and willfully discriminated against Relator on account of his age by terminating his employment and then failing to select him for a vacant position in violation of the ADEA.

225.   As a direct and proximate result of Fresenius Management Services, Inc.'s acts of intentional discrimination, Relator has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job related benefits.

226.   In addition, Fresenius Management Services, Inc.'s actions have caused, continue to cause, and will cause Relator to suffer damages for emotional distress, mental anguish and other non-pecuniary losses.

227.   Relator is entitled to an award of back pay and benefits, front pay, damages, liquidated damages, injunctive relief, attorneys' fees, and all other appropriate remedies, and other relief available under the ADEA and all federal statutes remedies for violations of the ADEA.

## COUNT VII
## FMLA INTERFERENCE
## (Fresenius Management Services, Inc.)

228.   Relator hereby incorporates and realleges all other paragraphs as if fully set forth herein.

229.   At all relevant times, FMS has been in an industry affecting commerce and it has employed 50 or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

230.   FMS is a covered employer and is subject to the provisions of the Family Medical Leave Act of 1993 ("FMLA").

231.   The Secretary of State has not filed suit on Plaintiff's behalf.

232.   In or around October 2017, Relator's doctor recommended that he undergo a surgical procedure on his right foot to address his condition, Achilles Tendinosis.

233.   Relator's surgery was set to occur on November 3, 2017.

234.   After learning of his need for surgery, Relator requested a medical leave of absence under the FMLA.

235.   FMS granted Relator's request for FMLA leave.

236.   While on approved FMLA leave, Relator underwent podiatric surgery on November 3, 2017.

237.   Relator worked from home before and after his surgery.

238.   Relator ceased working from home in February 2018.

239.   Upon returning to work, Relator learned that his position was eliminated and his employment would be terminated effective March 9, 2018.

240.   At all times material hereto, FMS and its agents knew of Relator's medical condition. Moreover, the employer and its agents knew that Relator's absences from work were due to his serious health condition and related surgery. At all times material hereto, FMS and its agents were also aware that Relator applied for and was approved FMLA leave.

241.   FMS's actions in terminating Relator's employment shortly after having taken FMLA leave and returning to work demonstrate violations of the FMLA's retaliation provisions.

242.   FMS's decision to terminate Relator's employment effective March 9, 2018, was made because of Relator's exercise of his protected rights under the FMLA.

243. At the time of the acts alleged, FMS knew or should have known that the means utilized to punish Relator for using his FMLA leave were forbidden by the law.

244. FMS performed the above actions willfully, wantonly, intentionally, and in reckless disregard of Relator's federally-protected rights.

245. As a direct result of FMS's actions, Plaintiff suffered and continues to suffer stress and injury, compensable by equitable relief or compensable in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendants:

(a) awarding the United States treble damages sustained by it for each of the false claims;

(b) awarding the United States a maximum civil penalty for each of the false claims and records;

(c) awarding Relator thirty percent (30%) of the proceeds of this action and any alternate remedy or the settlement of any such claim;

(d) awarding Relator litigation costs and reasonable attorneys' fees;

(e) awarding Relator all relief available, including special damages, resulting from retaliation pursuant to 31 U.S.C. § 3730(h);

(f) declaring Fresenius Management Services, Inc.'s discriminatory actions violated federal anti-discrimination laws;

(g) enjoining Fresenius Management Services, Inc. from further acts of discrimination and retaliation against Relator;

(h) entering judgment against Fresenius Management Services, Inc.'s for full back pay and other benefits and expenses in amounts to be proven at trial and all fringe and pension benefits of employment with pre-judgment and post-judgment interest under Title VII, Section 1981, the ADEA, and the FMLA;

(i) ordering Fresenius Management Services, Inc. to reinstate Relator, or grant front pay in lieu thereof under Title VII, Section 1981, the ADEA, and the FMLA;

(j) ordering modification or elimination of practices, policies, customs, and usages set forth herein and all other such practices shows to be in violation of law that they do not discriminate on the basis of serious health condition or the exercise of rights afforded by the Family Medical Leave Act;

(k) awarding Relator compensatory damages in an amount determined by the jury;

(l) awarding Relator punitive damages to the maximum allowable under

Title VII, Section 1981, and the ADEA;

(m) granting him a jury trial on all issues so triable; and

(n) granting such other relief as the Court may deem just and proper.

Respectfully submitted,

Julie Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
**Bracker & Marcus LLC**
3225 Shallowford Road, Suite 1120
Marietta, Georgia 30062
Telephone: (770) 988-5035
Facsimile: (678) 648-5544
Julie@fcacounsel.com
Jason@fcacounsel.com


Cherri L. Shelton
Georgia Bar No. 276937
Shelton Law Practice, LLC
2987 Clairmont Road NE, Suite 225
Atlanta, Georgia 30329
Telephone: (404) 865-3771
Facsimile: (678) 882-7499
cshelton@sheltonlawpractice.com